# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PAUL CAPITAL ADVISORS, L.L.C., a
Delaware limited liability company, PAUL
CAPITAL PARTNERS VIII-A, L.P., a
Delaware limited partnership, PAUL CAPITAL
PARTNERS VIII-B, L.P., a Delaware limited
partnership, PAUL CAPITAL PARTNERS
VIII-C, a Delaware limited partnership, PAUL
CAPITAL PARTNERS VIII HOLDINGS, a
California general partnership, PAUL
CAPITAL PARTNERS IX, L.P., a Delaware
limited partnership, and PAUL CAPITAL
TOWN STREET PARTNERS, L.P., a Delaware
limited partnership,

           Plaintiffs,

      v.

JOHN A. STAHL, as Trust Advisor of the LT-1
to LT-9 Exchange Trusts, MURRAY T.
HOLLAND, as former Trust Advisor of the LT-
1 to LT-9 Exchange Trusts, JAMES E. Turvey,
as former Trust Advisor of the LT-1 to LT-9
Exchange Trusts, DELAWARE TRUST
COMPANY, as Trustee of the LT-1 to LT-9
Exchange Trusts, MHT FINANCIAL L.L.C.,
THE BENEFICIENT COMPANY GROUP,
L.P., HIGHLAND CONSOLIDATED
BUSINESS HOLDINGS GP, L.L.C.,
BENEFICIENT MANAGEMENT, L.L.C.,
BENEFICIENT COMPANY HOLDINGS,
L.P., HIGHLAND CONSOLIDATED, L.P.,
BENEFICIENT HOLDINGS, INC.,
HIGHLAND REAL ASSETS, L.L.C., and
BENEFICIENT MANAGEMENT
COUNSELORS, L.L.C.,

           Defendants.

C.A. No. 2022-0167-SG

# MEMORANDUM OPINION

Date Submitted:  July 6, 2022
Date Decided: August 17, 2022
Date Corrected: August 25, 2022

David E. Ross, Eric D. Selden, and A. Gage Whirley, of ROSS ARONSTAM & MORITZ, LLP, Wilmington, Delaware; OF COUNSEL:  John F. Hartmann, P.C. and Ravi Subramanian Shankar, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Plaintiffs Paul Capital Advisors, L.L.C., Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII-B, L.P., Paul Capital Partners VIII-C, L.P., Paul Capital Partners VIII Holdings, Paul Capital Partners IX, L.P., and Paul Capital Town Street Partners, L.P.*

Stephen C. Norman and Ellis H. Huff, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendants Beneficient Company Group, L.P. and James Turvey.*

Norman M. Powell, Emily V. Burton, Lauren Dunkle Fortunato, Michael E. Neminski, and Nehama L. Hanoch, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, *Attorneys for Defendants Murray T. Holland and MHT Financial LLC.*

Brett M. McCartney, Elizabeth A. Powers, and Sarah T. Andrade, of BAYARD, P.A., Wilmington, Delaware; OF COUNSEL:  Michael K. Hurst and Sara H. Chelette, of LYNN PINKER HURST & SCHWEGMANN, Dallas, Texas, *Attorneys for Defendant John A. Stahl.*

**GLASSCOCK, Vice Chancellor**

This matter involves a contractual scheme that is, in the apt phrase of Defendants' counsel, a morass of complicated agreements. Notwithstanding that, the issue before me is straightforward, if novel. Where a party has a contractual right to receive payments from a trust, but the integrated trust agreement names beneficiaries and does not include the party as a beneficiary, is the party nonetheless a beneficiary, entitled to enforce statutory remedies available only to beneficiaries against the trust and the trust advisor? Under the facts here, I find the answer is no. The Defendants seek to dismiss Count I of the Second Amended Complaint (the "SAC"), in which the Plaintiffs seek to remove a trust advisor, under Section 3327 of Title 12. Standing to bring a petition under the statute is limited to "beneficiaries."[1]

The Plaintiffs here are Paul Capital Advisors, L.L.C. ("Paul Capital") and certain of its affiliates. They exist as investment fund managers. As of 2017, they intended to divest illiquid assets. With the assistance of counsel, and presumably for reasons they found advantageous, the Plaintiffs entered a convoluted transaction by which they transferred the illiquid assets to MHT Financial, L.L.C. ("MHT"), which was to monetize them through an auction, and which contracted to pay up to the first $550 million to the Plaintiffs; the amount realized beyond that amount belonged to MHT (the "Transaction"). This brief recitation simplifies and omits

_____

[1] As well as the "trustee" or "other officeholder," categories inapplicable here.

1

much of the series of transactions, explained in more detail below. To facilitate this scheme, MHT settled trusts with the assets (the "Exchange Trusts"). The purpose of the Exchange Trusts was to monetize the assets, pay over the first $550 million to the Plaintiffs, and distribute the remainder to MHT. As contemplated by the Transaction documents, the Exchange Trusts exchanged the illiquid assets for common units in The Beneficient Company Group, L.P. ("BEN"), which had contracted to pay the Plaintiffs any shortfall if the auction failed to generate $500 million. MHT and BEN then conducted an auction of the BEN common units.

The winning bidder in the auction was GWG Holdings, Inc. ("GWGH"), who purchased the BEN common units from the Exchange Trusts in return for cash and GWGH stock and "L-Bonds." The Exchange Trusts, as contractually required by the agreements governing them (the "Trust Agreements"), paid over the cash to the Plaintiffs, but the amount was not enough to satisfy MHT's and BEN's obligation to the Plaintiffs. The Exchange Trusts proved unable or unwilling to liquidate their remaining assets, the stock and L-Bonds of GWGH. In the meantime, GWGH entered voluntary bankruptcy.

The matter before me is the Plaintiffs' request to remove the "Trust Advisor" of the Exchange Trusts, under 12 *Del. C.* § 3327. That part of Plaintiffs' complaint is expedited; the bulk of the complaint consists of contract claims arising under the many documents that control the overall Transaction. The Plaintiffs allege that they

2

are beneficiaries under the Exchange Trusts, and that the Trust Advisor is aligned with GWGH, BEN, and MHT and will not properly advance the Plaintiffs' interests as an alleged beneficiary.

The Defendants have moved to dismiss for lack of standing. They note that the statutory relief sought is limited to "beneficiaries," that the Trust Agreements here enumerate the beneficiary as solely MHT, and they do not name the Plaintiffs as beneficiaries. Accordingly, per the Defendants, the Plaintiffs are not owed fiduciary duties under the Trust Agreements and have no standing to seek to remove the Trust Advisor.

The Plaintiffs point out that the statutory term "beneficiaries" is undefined, and that under our case law, adopting the Restatement of Trusts, any party that the settlor intended to include as a holder of a beneficial interest in the trust is a "beneficiary." The intent of the settlor controls. But in assessing that intent, I must rely on the words of the Trust Agreements, which do not include the Plaintiffs among the beneficiaries. The Plaintiffs point to the larger Transaction and its controlling documents. But even taking those into account, they provide that MHT—the settlor and sole beneficiary of the Exchange Trusts—and BEN have a contractual obligation to facilitate the sale of the illiquid assets, that MHT has a contractual obligation to pay over the initial payment to the Plaintiffs (with certain obligations of BEN to cover shortfalls), and that the Exchange Trusts have a fiduciary duty to MHT to

3

market and sell the assets, and a ministerial duty to pay up to the initial payment amount of the proceeds directly to the Plaintiffs.

In other words, the parties structured the Transaction so that contractual duties flowed from MHT and BEN to the Plaintiffs regarding the sale of the assets and payment of the $550 million, that MHT would create and use the Exchange Trusts to facilitate this payment as well as its own interests in the proceeds, and that fiduciary duties would flow from the Exchange Trusts to MHT only. Of course, the parties could have agreed to have the Plaintiffs be beneficiaries of the Exchange Trusts. This Transaction was among sophisticated parties aided by counsel, and I must conclude that the structure of the Transaction as provided in the various contracts was purposeful. Again, the explicit language of the Trust Agreements, which the parties agree are integrated documents, do not list the Plaintiffs as beneficiaries or describe an intent that they are due a beneficial interest in the Exchange Trusts. Accordingly, I find that the Plaintiffs are not beneficiaries of the Exchange Trusts and do not have standing to seek removal of the Trust Advisor. Their relief must come in an action based on the contracts.

My reasoning follows.

# I. BACKGROUND[2]

"The reader is forewarned that this case involves a maze of corporate entities and an alphabet soup of corporate names."[3] This Memorandum Opinion includes only those facts necessary to my analysis.

## A. *The Relevant Parties and Non-Parties*

Plaintiff Paul Capital is a Delaware limited liability company with its principal place of business in San Francisco, California, operating as a private equity firm.[4]

Plaintiffs Paul Capital Partners VIII-A, L.P.; Paul Capital Partners VIII-B, L.P.; Paul Capital Partners VIII-C, L.P.; and Paul Capital Partners IX, L.P. are Delaware limited partnerships with their principal places of business in San Francisco, California.[5] They are private equity funds.[6]

---

[2] Unless otherwise noted, the following facts are based on the Plaintiffs' Verified Second Amended Complaint, Dkt. No. 66 (the "SAC") and the documents incorporated by reference therein. *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 n.1 (Del. 1999) ("Since this is an appeal from a dismissal under Court of Chancery Rule 12(b)(1) for lack of jurisdiction, we must confine ourselves to the allegations of the complaint and exhibits thereto, which must be accepted as true for purposes of the motion to dismiss."); *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) ("In ruling upon a Rule 12(b)(6) motion to dismiss, the relevant universe of facts are ordinarily confined to the allegations of the petition."). Citations in the form of "Neminski Aff. —" refer to the Transmittal Affidavit of Michael E. Neminski in Support of Corrected Opening Brief of Defendants in Support of their Motions to Dismiss Count I of the Verified Second Amended Complaint, Dkt. No. 107. Citations in the form of "Neminski Aff., Ex. —" refer to the exhibits attached to the Neminski Affidavit, Dkt. No. 108.

[3] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *2 (Del. Ch. Sept. 18, 2014).

[4] SAC ¶ 10.

[5] *Id.* ¶¶ 11–14.

[6] *Id.*

Plaintiff Paul Capital Partners VIII Holdings is an investment holding company owned by Paul Capital Partners VIII-A, L.P., Paul Capital Partners VIII B, L.P., and Paul Capital Partners VIII-C, L.P.[7]  It is a California general partnership with its principal place of business located in San Francisco, California.[8]

Plaintiff Paul Capital Town Street Partners, L.P. is a Delaware limited partnership with its principal place of business in San Francisco, California, operating as a private equity fund.[9]

Plaintiffs Paul Capital Partners VIII-A, L.P.; Paul Capital Partners VIII-B, L.P.; Paul Capital Partners VIII-C, L.P.; Paul Capital Partners IX, L.P.; Paul Capital Partners VIII Holdings; and Paul Capital Town Street Partners, L.P. are referred to herein as the "Paul Capital Funds."

Defendant John Stahl is a Trust Advisor to the Exchange Trusts, and a resident of North Carolina.[10]

Defendant Murray Holland is a former Trust Advisor to the Exchange Trusts and a resident of Texas.[11]  Holland is also the Chairman, President, and CEO of GWGH, and a principal and owner of MHT.[12]

---

[7] *Id.* ¶ 15.
[8] *Id.*
[9] *Id.* ¶ 16.
[10] *Id.* ¶ 17.
[11] *Id.* ¶ 18.
[12] *Id.*

6

Defendant James Turvey is a former Trust Advisor to the Exchange Trusts and a resident of Texas.[13] Turvey is a senior executive of BEN, where he serves as Senior Vice President of Collateral Valuation.[14]

Defendant Delaware Trust Company is a Delaware corporation and serves as the trustee of the Exchange Trusts.[15]

Defendant MHT is a Delaware limited liability company with its principal place of business located in Dallas, Texas.[16]

Defendant BEN is a holding company of capital and financial services companies.[17] It is a Delaware limited partnership with its principal place of business in Dallas, Texas.[18]

Defendant Highland Consolidated Business Holdings GP, L.L.C. ("BEN GP") is a Delaware limited liability company.[19]

Defendant Beneficient Management, L.L.C. ("Successor BEN GP") is a Delaware limited liability company.[20]

---

[13] *Id.* ¶ 19.
[14] *Id.*
[15] *Id.* ¶ 20.
[16] *Id.* ¶ 21.
[17] *Id.* ¶ 22.
[18] *Id.*
[19] *Id.* ¶ 23.
[20] *Id.* ¶ 24.

Defendant Beneficient Company Holdings, L.P. ("BCH") is a Delaware limited partnership.[21]

Defendant Highland Consolidated, L.P. ("HCLP") is a Delaware limited partnership.[22]

Defendant Beneficient Holdings, Inc. ("Holdings") is a Delaware corporation.[23] Holdings, BEN, BEN GP, Successor BEN GP, BCH, and HCLP are collectively referred to herein as the "BEN CVR Parties."

Defendant Highland Real Assets, L.L.C. ("Highland") is a Delaware limited liability company.[24]

Defendant Beneficient Management Counselors, L.L.C. ("Counselors") is a Delaware limited partnership.[25] Highland, Counselors, and the BEN CVR Parties are collectively referred to as the "BEN Parties."

*B. Factual Background*

Paul Capital is a private equity firm, founded in 1991, that raises capital from investors, pools the funds into successive private equity funds, and invests the capital in those funds.[26] Paul Capital's funds primarily invested in limited partnership

---

[21] *Id.* ¶ 25.
[22] *Id.* ¶ 26.
[23] *Id.* ¶ 27.
[24] *Id.* ¶ 28.
[25] *Id.* ¶ 29.
[26] *Id.* ¶ 37.

interests in other private equity funds, which are commonly referred to as "secondary market" private equity interests, or "secondaries."[27]

By 2017, Paul Capital wanted to exit the private equity business and sell the secondaries that its funds were invested in.[28] Although Paul Capital's secondaries had an alleged net asset value of approximately $500 million,[29] secondaries are generally illiquid and "cannot easily be monetized into cash."[30] Nevertheless, Paul Capital found a buyer for its secondaries: Defendant BEN.[31] Paul Capital wanted to sell its secondaries for cash, but BEN did not have $500 million available in cash.[32] Paul Capital also needed to obtain consent from the underlying private equity funds that had issued the secondaries, which was something it wanted to avoid upfront.[33] To address these issues, Paul Capital and BEN devised the Transaction, using MHT as a middleman, to facilitate the sale of the secondaries from Paul Capital to BEN.[34]

At a high level, the Transaction proceeded in the following steps, which are depicted in Figure One.

---

[27] *Id.*
[28] *Id.* ¶ 38.
[29] *Id.*
[30] *Id.* ¶ 37.
[31] *Id.* ¶ 39.
[32] *Id.* ¶¶ 41–42.
[33] *Id.* ¶ 62.
[34] *Id.* ¶ 43.

# Transaction as Contemplated



Paul Capital

Paul Capital Funds

Step 1: Paul Capital Funds transfers Secondaries to MHT

MHT

Step 2: MHT transfers Secondaries and cash to Exchange Trusts

Step 5: Exchange Trusts monetize the Auction consideration and distribute the first $550 million in net cash proceeds to Paul Capital Funds*

Step 6: Exchange Trusts transfer net cash proceeds from Auction above $550 to MHT

BEN

Step 3: Exchange Trusts transfer Secondaries to BEN in exchange for BEN common units

*If the Auction fails to generate $550 million in net cash proceeds, BEN is obligated to make up the difference, up to $500 million

Exchange Trusts

Step 4: BEN common units sold in auction

Auction Winner (ultimately, GWGH)

Figure One. Simplified structure of the transaction as contemplated.

First, the Paul Capital Funds transferred their economic rights associated with the secondaries to MHT.[35]  MHT then formed nine Delaware trusts—the Exchange Trusts—and contributed its rights in the secondaries to them.[36]  Next, the Exchange Trusts transferred those rights associated with the secondaries to BEN in exchange for common equity units of BEN, which BEN committed to list on a U.S. exchange.[37]  MHT and BEN agreed to conduct a "prelisting auction" of the BEN common units (the "Auction").[38]  Under the Transaction documents, MHT was obligated to pay to the Paul Capital Funds up to $550 million in net cash proceeds from the Auction.[39]  If the Auction failed to generate net cash proceeds of at least $500 million, BEN was obligated to pay additional "contingent consideration" to the Paul Capital Funds, which the parties referred to as "contingent value rights" or "CVRs."[40]

### 1. The Transaction Documents

The parties memorialized the Transaction pursuant to several related contracts, described below.

---

[35] *Id.* ¶ 45.
[36] *Id.* ¶ 46.
[37] *Id.* ¶ 47.
[38] *Id.* ¶ 48.
[39] *Id.* ¶ 49.
[40] *Id.*

11

*a. The Transaction Agreement*

The parties agreed to and summarized the Transaction in a September 1, 2017 Transaction Agreement between Paul Capital, the Paul Capital Funds, MHT, BEN, and certain BEN affiliates.[41] In the recitals of the Transaction Agreement, the parties stated that they were entering into "a series of transactions . . . pursuant to which certain assets owned by the [Paul Capital] Funds would be acquired by MHT in exchange for the right to the proceeds from the sale of common equity units of BEN and the exercise of certain contingent rights as described herein."[42]

The Transaction Agreement stated that, "[a]fter the transactions," "[e]ach [Paul Capital] Fund will have the rights to the amounts due from MHT to the applicable [Paul Capital] Fund under the Purchase and Sale Agreement, which rights would effectively entitle each [Paul Capital] Fund to the proceeds from the sale of BEN Common Units to be held by the Exchange Trusts as set out below as well as the proceeds flowing through the CVRs."[43] The Transaction Agreement further provided that "[t]he Exchange Trusts will (a) have MHT as its beneficiary and (b) hold (i) the EDA Rights, (ii) the MHT BEN Units and (iii) all rights under the CVR Contract."[44]

---

[41] *Id.* ¶ 52.
[42] *Id.* ¶ 53; *see also* Neminski Aff., Ex. 3 at 1 [hereinafter the "Transaction Agreement"].
[43] Transaction Agreement, Ex. A at 1.
[44] *Id.*

In Section 5.5.1 of the Transaction Agreement, MHT and the BEN Parties agreed to "conduct an auction . . . of the Auction BEN Common Units as contemplated and consistent with Section 5 of the Purchase and Sale Agreement" and to "take any reasonable actions reasonably necessary in order to consummate the Auction on or prior to April 30, 2018."[45]  Likewise, in Section 5.2 of the Transaction Agreement, the parties agreed to "use commercially reasonable best efforts to . . . make effective the transactions contemplated by this Agreement."[46]

### b. The Purchase and Sale Agreement

The sale of the secondaries from the Paul Capital Funds to MHT was memorialized in a September 1, 2017 Purchase and Sale Agreement (the "PSA").[47] In Section 2 of the PSA, Paul Capital and the Paul Capital Funds agreed to sell the secondaries to MHT in exchange for the right to receive up to $550 million of the net cash proceeds generated by the Auction of the BEN common units.[48]

In Section 5(a) of the PSA, MHT agreed to commence the Auction of BEN common units within 60 days, and to use "good faith efforts" to complete the Auction by April 30, 2018.[49]  In Section 5(d) of the PSA, MHT agreed to use its "best commercial efforts" to complete the Auction for net cash proceeds of at least

---

[45] SAC ¶ 55; Transaction Agreement § 5.5.1.
[46] SAC ¶ 56; Transaction Agreement § 5.2.
[47] SAC ¶¶ 57–61; Neminski Aff., Ex. 1 [hereinafter the "PSA"].
[48] SAC ¶ 59; *see also* PSA § 2.
[49] SAC ¶ 60; *see also* PSA § 5(a).

13

$500 million, and to invoke and enforce the Paul Capital Funds' "contingent value rights" if the Auction failed to generate net cash proceeds of at least $500 million.[50] However, under Section 5(b) of the PSA, Paul Capital and the Paul Capital Funds agreed that "there is no guarantee of what the final terms of the Auction will be or if any Auction will be successful or will occur at all."[51]

Section 2(d) of the PSA required MHT to establish and deposit the secondaries into the Exchange Trusts.[52] Section 2(d) then contemplated that the Exchange Trusts would distribute up to $550 million of any cash proceeds to Paul Capital.[53]

### c. The Economic Direction Agreement

As discussed above, the Paul Capital Funds could not transfer the secondaries to MHT until they received approval from the underlying private equity funds that issued the secondaries.[54] Thus, the Transaction involved an "Economic Direction Agreement," which provided that MHT, and in turn, BEN, had the right to the dividends, distributions, or other payments or proceeds generated by the secondaries, pending the actual transfer of the secondaries.[55] Paul Capital, the Paul Capital

---

[50] SAC ¶ 61; *see also* PSA § 5(d).
[51] PSA § 5(b).
[52] *See id.* § 2(d).
[53] *See id.*
[54] *See supra* note 33 and accompanying text.
[55] SAC ¶ 62.

14

Funds, the Exchange Trusts, MHT, and BEN were among the parties to the Economic Direction Agreement.[56]

### d. The Trust Agreements

The PSA required MHT to establish the Exchange Trusts and to contribute its rights associated with the secondaries to the Exchange Trusts.[57]  MHT established the Exchange Trusts pursuant to nine identical Trust Agreements, dated September 1, 2017.[58]  Under the Trust Agreements, MHT was the settlor of the Exchange Trusts, and the Delaware Trust Company acted as an administrative trustee.[59]  The Trust Agreements also named two "Trust Advisors":  (i) Defendant Holland and (ii) a BEN executive who was then replaced with Defendant Turvey, another BEN executive.[60]

The Trust Agreements granted the Trust Advisors the authority to manage and direct the activities of the Exchange Trusts.[61]  The Trust Agreements also required the Trust Advisors to "take all steps necessary and advisable to commence and consummate the Auction [of the BEN common units] as contemplated by the Transaction Agreement, including, without limitation fully exercising the Protection

---

[56] *Id.*
[57] *See* PSA § 2(d).
[58] SAC ¶ 64.
[59] *Id.*
[60] *Id.* ¶¶ 46, 64.
[61] *Id.* ¶ 65.

15

Rights."[62]  Further, the Trust Advisors were required under the Exchange Trust Agreements "to take all steps necessary to distribute the Auction Consideration (including all proceeds received in connection with the Protection Rights)" to the Paul Capital Funds.[63]

The Exchange Trust Agreements define the "Beneficiary" of the Exchange Trusts to be "the persons or organizations who are beneficiaries of the [Exchange] Trusts and designated as such in Exhibit A."[64]  Exhibit A designates MHT as the only beneficiary of the Exchange Trusts.[65]

*e. The MHT-BEN Letter Agreement*

As discussed above, once MHT deposited the secondaries in the Exchange Trusts, the Exchange Trusts exchanged them for common units in BEN, which BEN committed to list on a U.S. exchange.[66]  The Exchange Trusts accomplished this exchange via a September 1, 2017 letter agreement among the Exchange Trusts, MHT, and BEN.[67]  As a result of the exchange, BEN held the economic rights associated with the secondaries, and the Exchange Trusts held common units in

---

[62] *Id.* ¶ 68.
[63] *Id.* ¶ 69.
[64] *E.g.*, Neminski Aff., Ex. 2 [hereinafter "LT-1 Exchange Trust Agreement"] § VII.D.
[65] *E.g.*, *id.*, Ex. A.
[66] SAC ¶ 70.
[67] *Id.* ¶ 71.

BEN—which BEN had agreed to list on a U.S. exchange, and which MHT and BEN had agreed to sell in the Auction.[68]

### f. The CVR Contract

As explained above, if the Auction failed to generate at least $500 million in net cash proceeds, BEN was required to pay the Paul Capital Funds additional "contingent value rights," or "CVRs."[69] This obligation was memorialized in a September 1, 2017 "CVR Contract" executed by MHT and the BEN CVR Parties.[70] Under the CVR Contract, if the Auction failed to generate at least $500 million in net cash proceeds, BEN and certain subsidiaries were required to make up that shortfall by contributing additional BEN common units "and/or" cash to the Exchange Trusts.[71] The CVR Contract states that the Exchange Trusts are "an intended third party beneficiary of this [CVR Contract] Agreement."[72] Defendant Holland signed the CVR Contract on behalf of MHT.[73]

### 2. The Parties Conduct the Auction

In late 2017, BEN and MHT conducted the Auction.[74] On December 23, 2017, Holland, on behalf of MHT, informed Paul Capital that the Auction had

---

[68] *Id.* ¶ 72.
[69] *Id.* ¶ 73.
[70] *Id.* ¶ 75.
[71] *Id.* ¶ 76.
[72] *Id.* ¶ 75.
[73] *Id.* ¶ 77.
[74] *See id.* ¶ 78.

generated a winning bid.[75] The winning bid, from GWGH, was not an all-cash proposal.[76] Instead, it was a combination of cash and GWGH stock and "L-Bonds."[77] Specifically, the winning bid was composed of (i) $150 million in cash, (ii) GWGH L-Bonds, which were GWGH-issued bonds secured by GWGH's assets, with a principal amount of $250 million, and (iii) GWGH common stock worth $150 million.[78] Thus, GWGH's winning bid was worth $550 million in aggregate consideration.[79]

Because Paul Capital and the Paul Capital Funds were entitled to the first $550 million in net cash proceeds from the Auction, they wanted the Auction consideration to be all cash, not a combination of cash, common stock and bonds.[80] But the parties contemplated that the L-Bonds and the common stock could be liquidated quickly; indeed, GWGH represented that it intended to use "commercially reasonable efforts to effect expeditiously" "the refinancing in full of the aggregate principal amount outstanding of the GWG[H] L-Bonds issues to each of the Seller Trusts."[81]

---

[75] *Id.*
[76] *Id.* ¶ 79.
[77] *Id.* ¶ 86.
[78] *Id.*
[79] *Id.* ¶¶ 86–87.
[80] *E.g.*, *id.* ¶ 94, 112.
[81] *See id.* ¶ 106; *see also id.* ¶¶ 88–90, 92, 96–97, 100.

In connection with the winning bid, the Trust Advisors sent Paul Capital and the Paul Capital Funds an undertakings letter that was "acknowledged and agreed to" by MHT (the "Undertakings Letter").[82] The Undertakings Letter was signed by Defendant Holland, both in his capacity as a Trust Advisor to the Exchange Trusts, and in his capacity as the Managing Member of MHT.[83] The Undertakings Letter acknowledged that GWGH had committed to use "commercially reasonable efforts to refinance outstanding debt with a more favorable credit facility and/or institutional note within 12 months following the Closing," and that the GWGH contemplated an "orderly resale" of the GWGH common stock."[84] The Trust Advisors also agreed in the Undertakings letter to "cooperate with MHT to the full extent of the authority granted to us" to liquidate the L-Bonds and GWGH common stock by "the earliest practicable date during 2018."[85] Further, the Trust Advisors acknowledged in the Undertakings Letter that the Paul Capital Funds were each "a designated third party beneficiary of the agreements, covenants, and undertakings set forth herein and, accordingly, entitled to rely upon and enforce such agreements, covenants, and undertakings."[86]

---

[82] *Id.* ¶ 107.
[83] *Id.*
[84] *Id.* ¶ 108.
[85] *Id.* ¶ 109.
[86] *Id.* ¶ 111.

On January 11, 2018, Paul Capital and the Paul Capital Funds agreed to go forward with the GWGH winning bid.[87] The next day, on January 12, 2018, the Exchange Trusts, MHT, BEN, and GWGH entered into a Master Exchange Agreement to memorialize the terms of the GWGH winning bid.[88]

The Auction ultimately closed in two stages. In the initial closing, which occurred on August 10, 2018, the Exchange Trusts transferred 70% of the BEN common units to GWGH in exchange for $250 million in GWGH L-Bonds and $100 million in cash, with an additional $50 million in cash to be paid by BEN by December 14, 2018.[89] In a second closing, on December 31, 2018, the Exchange Trusts received the $150 million in GWGH common stock in exchange for the remaining BEN common units.[90] Ultimately, the Exchange Trusts "directly wired almost all of the $150 million to the [Paul Capital] Funds, and BEN directly wired the remaining amount directly to the [Paul Capital] Funds."[91] As a result, as of the end of 2018, the Exchange Trusts no longer held any BEN common units.[92] Instead, they held GWGH L-Bonds with an aggregate face amount of $250 million, and GWGH common stock valued at $150 million.[93]

---

[87] *Id.* ¶ 112.

[88] *Id.* ¶ 114.

[89] *Id.* ¶¶ 131, 137–138. The SAC alleges that BEN failed to pay that $50 million by December 14, 2018. *Id.* ¶¶ 150–56.

[90] *Id.* ¶¶ 131, 157.

[91] *Id.* ¶ 173.

[92] *Id.* ¶ 158.

[93] *Id.*

Although the GWGH winning bid contemplated that the L-Bonds and GWGH common stock would be liquidated quickly, they remain unliquidated. In the years since the winning bid closed, GWGH's financial condition has deteriorated. In October 2020, GWGH learned that it was the subject of an SEC investigation.[94] Months later, GWGH missed the March 31, 2021 deadline for filing its Annual Report on Form 10-K for the year ended December 31, 2020 as a result of certain accounting issues.[95] Because of its failure to timely file its 2020 10-K, GWGH suspended sales of its L-Bonds and resorted to its liquidity reserves for funding.[96] When GWGH ultimately filed its 2020 10-K on November 5, 2021, it disclosed a "going concern" qualification and material weaknesses in its internal controls over financial reporting and its disclosure controls.[97] GWGH resumed sales of L-Bonds on December 1, 2021, but only briefly.[98]

On January 6, 2022, GWGH announced that its independent auditing firm would not stand for reappointment.[99] A week later, on January 15, 2022, GWGH announced that it had failed to pay approximately $13.6 million in L-Bond payments that were due that day.[100] It also announced that it would likely miss its March 31,

---

[94] *Id.* ¶ 218.
[95] *Id.* ¶ 219.
[96] *Id.* ¶ 220.
[97] *Id.* ¶ 221.
[98] *Id.* ¶ 226.
[99] *Id.* ¶ 227.
[100] *Id.* ¶ 228.

2022 deadline for filing its Annual Report on Form 10-K for the year ended December 2021, and that it had resuspended its sale of L-Bonds on January 10, 2022.[101] And, it announced that its board of directors authorized management to hire financial and legal restructuring advisors to help evaluate liquidity and capital structure alternatives.[102] On January 27, 2022, the *Wall Street Journal* reported that GWGH was seeking "rescue financing" to avoid bankruptcy.[103] The value of the GWGH common stock held in the Exchange Trusts, initially $150 million, plummeted to $60 million.[104]

## C. The Plaintiffs File This Action

The Plaintiffs filed this action on February 18, 2022, bringing one count to remove Holland and Turvey as the Trust Advisors of the Exchange Trusts.[105] The initial complaint alleged that Holland and Turvey should be removed because of purported conflicts of interest arising from the interwoven relationships between GWGH, BEN, MHT, Holland, and Turvey, and because of Holland's and Turvey's alleged failure to monetize the L-Bonds and GWGH common stock.[106]

---

[101] *Id.*
[102] *Id.*
[103] *Id.* ¶ 230.
[104] *Id.* ¶ 232.
[105] *See* Verified Compl., Dkt. No. 1 ¶¶ 215–32.
[106] *See id.*

The Plaintiffs also filed a motion to expedite, seeking an expedited trial in May 2022.[107] On March 9, 2022, I held a hearing regarding the Plaintiffs' motion to expedite, during which I ordered expedited motion to dismiss briefing, but reserved judgment regarding an expedited trial pending resolution of the Defendants' motions to dismiss.[108]

On March 29, 2022, the Defendants filed an opening brief in support of their motion to dismiss.[109] Instead of opposing the motion to dismiss, the Plaintiffs filed an amended complaint on April 19, 2022.[110] The amended complaint reasserted Count I, seeking to remove Holland and Turvey as Trust Advisors, and added several additional counts based on the various contracts related to the Transaction.[111] The same day, Holland and Turvey resigned as Trust Advisors, and MHT and BEN countersigned the resignations in order to waive a 30-day notice requirement.[112] In their place, MHT appointed Stahl as the new Trust Advisor to the Exchange Trusts.[113] Stahl immediately began taking actions as the new Trust Advisor.[114] The Plaintiffs were not informed of Holland's and Turvey's resignations until the

---

[107] *See generally* Pls.' Mot. Expedited Proceedings, Dkt. No. 1.
[108] Tr. Telephonic Oral Arg. and Rulings Ct. Pls.' Mot. Expedited Proceedings, Dkt. No. 33 at 19:20–21:20.
[109] Opening Br. Defs. Supp. Their Mots. Dismiss Verified Compl., Dkt. No. 43.
[110] Verified Am. Compl., Dkt. No. 55.
[111] *Id.* ¶¶ 232–337.
[112] SAC ¶ 240.
[113] *Id.* ¶ 242.
[114] *E.g.*, *id.* ¶¶ 244–48.

afternoon of April 20, 2022,[115] and they were not informed of Stahl's appointment until April 25, 2022.[116]

Also on April 20, 2022, GWGH filed for bankruptcy.[117] I held a teleconference on April 28, 2022, during which I held that the resignations of Holland and Turvey mooted Count I of the amended complaint, which sought to remove them.[118] I also granted the Plaintiffs leave to file a second amended complaint seeking to remove the new Trust Advisor, Stahl.[119]

The Plaintiffs filed the SAC on May 6, 2022.[120] The SAC reasserts Count I, this time seeking to remove Stahl as the Trust Advisor to the Exchange Trusts, and brings several non-expedited counts.[121] The Defendants moved to dismiss the SAC on May 20, 2022[122] and June 6, 2022.[123] The parties briefed the motions to dismiss as they relate to Count I,[124] and I held oral argument on July 6, 2022. I consider the matter fully submitted as of that date.

---

[115] *Id.* ¶ 254.

[116] *Id.* ¶ 263.

[117] *Id.* ¶ 234.

[118] Tr. Telephonic Status Conference, Dkt. No. 67 at 12:5–13:3.

[119] *Id.*

[120] *See generally* SAC.

[121] *Id.* ¶¶ 271–392.

[122] Mot. Dismiss, Dkt. No. 74; Mot. Dismiss Verified Second Am. Compl., Dkt. No. 75.

[123] Def. John A. Stahl's Mot. Dismiss Pls.' Verified Second Am. Compl., Dkt. No. 98.

[124] Corrected Opening Br. Defs. Supp. Their Mots. Dismiss Count I Verified Second Am. Compl., Dkt. No. 106; Joinder Def. John A. Stahl Corrected Opening Br. Defs. Supp. Their Mots. Dismiss Count I Verified Second Am. Compl., Dkt. No. 109; Pls.' Answering Br. Opp. Defs.' Mot. Dismiss, Dkt. No. 117 [hereinafter "Pls.' AB"]; Defs.' Reply Br. Supp. Mot. Dismiss, Dkt. No. 129.

## II. ANALYSIS

### A. *The Motion to Dismiss Standards*

The Defendants have moved to dismiss the SAC for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Under Rule 12(b)(1), the Court must "dismiss an action for lack of subject matter jurisdiction if it appears from the record that the Court does not have jurisdiction over the claim."[125] In considering a motion to dismiss under Rule 12(b)(1), "[t]he burden of establishing the court's subject matter jurisdiction rests 'with the party seeking the Court's intervention.'"[126] In reviewing a motion to dismiss under Rule 12(b)(1), the Court "may consider documents outside the complaint,"[127] although "[w]hen a challenge to subject matter jurisdiction is directed to the face of a complaint, the court accepts the plaintiff's allegations of fact."[128]

Under Rule 12(b)(6), I may only dismiss a complaint if I conclude that "the plaintiff[s] would not be entitled to recover under any reasonably conceivable set of circumstances."[129] In making this determination, I must "accept all well pleaded factual allegations as true," including "vague allegations" that "give the opposing

---

[125] *Ropp v. King*, 2007 WL 2198771, at *2 (Del. Ch. July 25, 2007).
[126] *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 882 (Del. Ch. 2008) (quoting *Ropp*, 2007 WL 2198771, at *2).
[127] *Id.*
[128] *Zebroski v. Progressive Direct Ins. Co.*, 2014 WL 2156984, at *3 (Del. Ch. Apr. 30, 2014) (quoting *Diebold Computer Leasing, Inc. v. Com. Credit Corp.*, 267 A.2d 586, 588 (Del. 1970)).
[129] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

party notice of the claim," and "draw all reasonable inferences in favor of the non-moving party."[130]

The Defendants contend that the Plaintiffs lack standing to remove Stahl as the Trust Advisor, and even if they had standing, they have failed to state a claim for Stahl's removal. "The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[131] Standing "is concerned only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[132] When "the issue of standing is related to the merits, a motion to dismiss is properly considered under Rule 12(b)(6) rather than 12(b)(1)."[133] But where "a party is arguing that the court lacks the authority to grant the relief requested by the plaintiff, standing is a jurisdictional question" evaluated under Rule 12(b)(1).[134] As explained below, I find that the Plaintiffs lack standing to bring this action, regardless of which provision of Rule 12 applies.

---

[130] *Id.*

[131] *Spiro v. Vions Tech. Inc.*, 2014 WL 1245032, at *8 (Del. Ch. Mar. 24, 2014) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[132] *Id.* (quoting *Stuart Kingston*, 596 A.2d at 1382) (emphasis omitted).

[133] *Id.* (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285–86 (Del. 2007).

[134] *Id.*

26

*B. The Plaintiffs Lack Standing to Remove Stahl*

The Plaintiffs seek to remove Stahl as the Trust Advisor of the Exchange Trusts under the removal provisions in Delaware's statute governing trusts, 12 *Del. C.* § 3327. Section 3327 provides as follows:

> If a governing instrument expressly permits an officeholder . . . to be removed, the officeholder may be removed in accordance with the terms of the governing instrument. In addition, the Court of Chancery may remove an officeholder on the Court's own initiative or on petition of a trustor, another officeholder, or beneficiary if:
>
> (1) The officeholder has committed a breach of trust; or
>
> (2) The continued service of the officeholder substantially impairs the administration of the trust; or
>
> (3) The court, having due regard for the expressed intention of the trustor and the best interests of the beneficiaries, determines that notwithstanding the absence of a breach of trust, there exists:
>
>> a. A substantial change in circumstances;
>>
>> b. Unfitness, unwillingness or inability of the officeholder to administer the trust or perform its duties properly; or
>>
>> c. Hostility between the officeholder and beneficiaries or other officeholders that threatens the efficient administration of the trust.[135]

Accordingly, Section 3327 provides that an officeholder may be removed "in accordance with the terms of the governing instrument," "on the Court's own initiative," or "on petition of a trustor, another officeholder, or beneficiary."[136] The

---

[135] 12 *Del. C.* § 3327.
[136] *Id.*

Plaintiffs do not seek to remove Stahl under "the terms of the governing instrument" or as trustors or officeholders.[137]  Rather, they contend that they are entitled to seek Stahl's removal under Section 3327 by virtue of their alleged status as "beneficiaries" of the Exchange Trusts.[138]

The Defendants contend that the Plaintiffs lack standing to seek Stahl's removal because they are not "beneficiaries" of the Exchange Trusts.  Section 3327 does not define the term "beneficiary."[139]  But the Restatement (Third) of Trusts, which Delaware courts look to as persuasive authority when resolving trust disputes,[140] instructs that "[a] person is a beneficiary of a trust if the settlor manifests an intention to give the person a beneficial interest; a person who merely benefits incidentally from the performance of the trust is not a beneficiary."[141]  A trust beneficiary is in a fiduciary relationship with a trustee and any trust advisor.[142]  It is the intent of the settlor to create such fiduciary relationships that is the *sine qua non* of the trust.

Accordingly, I must ascertain the settlor's intent when determining the identity of the Exchange Trusts' beneficiaries.  "To determine a settlor's intent, this

---

[137] *See* Pls.' AB at 29 n.6 ("[T]he PCA Seller Funds do not claim a contractual right to seek Stahl's removal.  Rather, they have a right to do so as beneficiaries under 12 *Del. C.* § 3327.").
[138] *Id.*
[139] *See* 12 *Del. C.* § 3327.
[140] *See Otto v. Gore*, 45 A.3d 120, 130 (Del. 2012) (relying on Restatement (Third) of Trusts); *Taylor v. Jones*, 2006 WL 1566467, at *4 (Del. Ch. May 25, 2006) (same).
[141] Restatement (Third) of Trusts § 48.  *See also id.* cmt. a.
[142] *See* 12 *Del. C.* § 3301(d).

28

Court looks to the language in the trust."[143]  The Trust Agreements define "Beneficiary" as "the persons or organizations who are beneficiaries of the [Exchange] Trust and designated as such in Exhibit A, as amended or updated from time to time."[144]  Exhibit A to the Trust Agreements identifies MHT as the lone beneficiary.[145]

According to the Defendants, that ends the inquiry—the Plaintiffs are not beneficiaries.  I agree.  If the language of a trust's governing document "is unambiguous, the Court looks no further and does not consider extrinsic evidence of intent."[146]  The Court cannot "look to extrinsic evidence to read ambiguity into an unambiguous contract."[147]  This is particularly true where, as here, the Trust Agreements at issue are fully integrated.[148]

The Trust Agreements identify only one beneficiary: MHT.[149]  "If the drafters of the Trust Agreement[s] . . . had intended the [Trust Advisor] to administer the [Exchange] Trusts in the interests of another deal party, the Trust Agreements would have said so."[150]  They do not.  It is thus manifest from the language of the Trust Agreements that the settlor, MHT, intended itself to be the only beneficiary.

---

[143] *Est. of Tigani*, 2016 WL 593169, at *18 (Del. Ch. Feb. 12, 2016).
[144] *See supra* note 64 and accompanying text.
[145] *See supra* note 65 and accompanying text.
[146] *Tigani*, 2016 WL 593169, at *18.
[147] *Id.*
[148] *E.g.*, LT-1 Exchange Trust Agreement § IX.B.
[149] *See supra* note 65 and accompanying text.
[150] *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 188 (Del. Ch. 2020).

29

The Plaintiffs do not dispute that the Trust Agreements name only MHT as a beneficiary. Rather, they contend that I must look beyond the language of the Trust Agreements and consider the broader context of the Transaction as a whole, the ostensible purpose of which was to allow the Plaintiffs to sell the secondaries to BEN in exchange for cash.[151] According to the Plaintiffs, the overall scheme of the Transaction shows that the parties intended the Plaintiffs to benefit from the Exchange Trusts.[152]

The Plaintiffs emphasize that under the terms of the various Transaction documents, they are entitled to the first $550 million of proceeds from the assets held in the Exchange Trusts.[153] For example, the Plaintiffs note that under the Transaction Agreement, the parties agreed that they were entering into "a series of transactions . . . pursuant to which certain assets owned by the [Paul Capital] Funds would be acquired by MHT in exchange for the right to the proceeds from the sale of common equity units of BEN and the exercise of certain contingent rights as described herein."[154] The Plaintiffs further note that the Transaction Agreement provided that overall Transaction would "effectively entitle each [Paul Capital] Fund to the proceeds from the sale of the BEN Common Units to be held by the Exchange

---

[151] Pls.' AB § I.
[152] *Id.*
[153] *Id.*
[154] *See supra* note 42 and accompanying text.

30

Trusts."[155]  Likewise, the Plaintiffs point out that the parties to the PSA agreed that "each applicable Exchange Trust shall distribute to Sellers with respect to the Interests all undistributed Realized Consideration."[156]  Finally, the Plaintiffs note that MHT, the Trust Advisors, and the Exchange Trusts acknowledged in the Undertakings Letter that under the PSA, "'the Exchange Trusts shall only distribute cash' to the Sellers, subject to certain limited exceptions in the event of a request from a Seller."[157]  These, I note, are *contractual* provisions bestowing on the Plaintiffs *contractual* rights.

Beyond the language of the Transaction documents, the Plaintiffs also point to the Exchange Trusts' post-signing conduct to support their argument that they are beneficiaries.  In particular, the Plaintiffs note that when the Exchange Trusts distributed the cash component of the GWGH winning bid, they distributed the cash directly to the Paul Capital Funds.[158]  According to the Plaintiffs, this is consistent with the Paul Capital Funds being beneficiaries of the Exchange Trusts.[159]

Because the terms of the Exchange Trust Agreements are fully integrated and unambiguously name MHT as the sole beneficiary, I may not consider the terms of other contracts executed in connection with the Transaction, or the post-signing

---

[155] *See supra* note 43 and accompanying text.
[156] Transaction Agreement § 2(d).
[157] Neminski Aff., Ex. 9 at 1.
[158] Pls.' AB at 32–33.
[159] *Id.*

conduct of the Exchange Trusts in distributing the cash.[160]  But in any event, the

other Transaction documents do not indicate that the parties intended the Plaintiffs

to be *beneficiaries* of the Exchange Trusts.  Notably, the Transaction Agreement on

which the Plaintiffs rely states that "[t]he Exchange Trusts will . . . have MHT as its

beneficiary."[161]  The Transaction Agreement therefore does not manifest an intent to

make the Plaintiffs beneficiaries of the Exchange Trusts.  To the contrary, all the

Transaction Agreement, PSA, and Undertakings Letter establish is that the Plaintiffs

have a contractual right, enforceable against MHT, to be paid up to the first $550

million in net cash proceeds from the assets in the Exchange Trusts.  That is, they

establish that the Plaintiffs have a contractual, not a beneficial, interest in those

proceeds.  Neither the Trust Agreements themselves, then, nor the other agreements

---

[160] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) ("If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent.").  The Plaintiffs' reliance on *Jo Ann Howard and Associates, P.C. v. Cassity* is misplaced.  868 F.3d 637 (8th Cir. 2017).  In *Jo Ann*, a federal appeals court interpreting a repealed Missouri statute governing contracts and trusts for "preneed funeral" services held that the beneficiaries of those trusts included funeral providers, *id.* at 643, 646–48, despite a contractual definition of "beneficiary" that identified only the decedents and the purchasers of the contracts, *Jo Ann Howard & Assocs., P.C. v. Cassity*, 2015 WL 13675548, at *4 (E.D. Mo. Jan. 9, 2015).  The Plaintiffs are correct that, in looking beyond the contractual definition to find that the funeral homes were beneficiaries, the *Jo Ann* court noted that "[t]he central purpose of the preneed trusts was to ensure the availability of funds to pay funeral homes."  *Jo Ann*, 868 F.3d at 647.  But in doing so, it relied heavily on the "statutory scheme" governing the funeral service contracts and corresponding trusts, which provided that the funeral homes "were entitled to a distribution directly from the trust" "if [the seller] failed" to pay them.  *See id.* at 646–47; *see also Jo Ann*, 2015 WL 13675548, at *5.  No equivalent "statutory scheme" exists here from which this Court could divine an intent regarding the beneficiaries of the Exchange Trusts that differs from what is memorialized in the Transaction documents.  Regardless, *Jo Ann* is a federal decision interpreting the trust law of a different state.  It is not binding on this Court, and I decline to follow the Plaintiffs' reading of it.
[161] *See supra* note 44 and accompanying text.

involved, manifest an intent to create a fiduciary relationship between the trust fiduciaries and the Plaintiffs.

Nor does the fact that the Exchange Trusts "directly wired" cash proceeds to the Plaintiffs establish that they held a beneficial interest in the Exchange Trusts. The PSA makes clear that the payment obligation is owed by MHT: "The Net Purchase Consideration (and, as applicable, any Net Purchase Consideration Premium) shall be payable by [MHT] promptly . . . ."[162] But the PSA does not require MHT to make that payment directly. Instead, it merely requires MHT to "pay (or cause to be paid) to each Seller . . . the economic rights . . . to which such Seller is entitled."[163] Consistent with PSA's requirement that MHT "pay" or "cause to be paid" the proceeds, the Trust Agreements provide that "[a]ll distributions . . . of trust funds, either income or principal, may be . . . expended for the benefit of [MHT]."[164] Thus, the Transaction documents establish that although MHT was obligated to ensure that the payments were made to the Plaintiffs, the Exchange Trusts could make those payments directly on MHT's behalf. That is exactly what happened with the cash component of GWGH's winning bid.

At bottom, the Plaintiffs have established an incidental interest, as contractual counterparties, in the proceeds of the assets held in the Exchange Trusts. "[A] person

---

[162] PSA § 2(c).
[163] *Id.* § 2(b).
[164] LT-1 Exchange Trust Agreement § III.G.

33

who merely benefits incidentally from the performance of the trust is not a beneficiary."[165]  The Plaintiffs are not beneficiaries.

Section 3327 confers a trust's "trustor, another officeholder, or beneficiary" with standing to seek the removal of an officeholder.[166]  The Plaintiffs only claim to standing here is their alleged status as beneficiaries.  Accordingly, because they are not beneficiaries of the Exchange Trusts, they lack standing to seek Stahl's removal as the Trust Advisor of the Exchange Trusts.[167]  "The absence of a party with standing will require dismissal."[168]  Count I is therefore dismissed.

### III. CONCLUSION

For the foregoing reasons, the Defendants' Motion is GRANTED with respect to Count I.  The parties should confer and submit a form of order consistent with this Memorandum Opinion.  The parties should also inform me whether they believe

---

[165] Restatement (Third) of Trusts § 48.

[166] 12 *Del. C.* § 3327.

[167] The Plaintiffs also pointed out in a preliminary conference that, even if they do not have standing, Section 3327 authorizes this Court to remove a trustee "on the Court's own initiative." Tr. Telephonic Scheduling Conference, Dkt. No. 95 at 8:10–22; *see also* SAC ¶¶ 274–75.  The Plaintiffs did not raise this argument in their motion to dismiss briefing, and I therefore consider it waived. *See Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *6 n.65 (Del. Ch. July 31, 2019) ("Issues not briefed are deemed waived." (quoting *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999)).  But in any event, "one who lacks a beneficial interest in a trust has no standing to enforce it," *Sergeson v. Del. Tr. Co.*, 413 A.2d 880, 882 (Del. 1980), and "[t]he absence of a party with standing will require dismissal," *Ropp*, 2007 WL 2198771, at *2.  The Court's "initiative" in removing a trust fiduciary is limited to acting on behalf of those in a fiduciary relationship to this trust.  The Plaintiffs cannot escape this Court's standing requirement by asking this Court to remove Stahl "on [its] own initiative."  Equity does not support such action, in any event, because the Plaintiffs may enforce the rights they bargained for, in contract.

[168] *Ropp*, 2007 WL 2198771, at *2.

34

Count II, which asserts breach of fiduciary duty claims against Holland and Turvey,[169] should also be dismissed for lack of standing, and if so, whether this Court has subject matter jurisdiction over the remaining counts.

---

[169] SAC ¶¶ 289–305.